NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0639n.06

**FILED**

**AUG 1 8 2014**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**DEBORAH S. HUNT, Clerk**

ENRIQUE SEOANE-VAZQUEZ,

      Plaintiff-Appellant,

v.

THE OHIO STATE UNIVERSITY,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

---

**BEFORE: SILER, BATCHELDER, and CLAY, Circuit Judges.**

CLAY, J., delivered the opinion of the court in which SILER and BATCHELDER, JJ., concurred, except as to the issue discussed in Part III of the Discussion Section, "Ttile VII Retaliation: Plaintiff's Internal Appeal." BATCHELDER, J., delivered a separate opinion on that issue, in which SILER, J., joined.

**CLAY, Circuit Judge.** Plaintiff Enrique Seoane-Vazquez appeals from the district court's grant of summary judgment in favor of Defendant The Ohio State University ("University") on Plaintiff's claims of retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* We **AFFIRM** for the reasons set forth in this opinion and the opinion of Chief Judge Batchelder.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.   Plaintiff's Hiring, Complaints, and 2007 Lawsuit

In August 2002, Plaintiff, a native of Spain, was hired as an assistant professor in the University's College of Pharmacy ("COP"), serving in the Pharmacy Practice and Administration Division ("Division"). Plaintiff also had a courtesy appointment to the College of Public Health, which did not pay any portion of Plaintiff's salary. Plaintiff's position was on the tenure track. Whether Plaintiff would ultimately be awarded tenure depended on his performance in three areas—scholarship, teaching, and service.

In 2004, as part of the service requirement, Dr. Milap Nahata, the Division's chair, appointed Plaintiff to serve on a search committee for a prestigious professorship. The search came to focus on Dr. Rajesh Balkrishnan, then a professor at the University of Texas at Houston. Plaintiff was concerned about Balkrishnan's relationship with his colleagues in Texas, and asked Nahata to request letters of recommendation before appointing him. Nahata declined and Balkrishnan was hired. According to Plaintiff, Nahata and Balkrishnan—both of Indian origin— waged a vindictive campaign against him within the COP. Plaintiff's graduate students were allegedly told to stop working with him. One student of Indian origin was told he should not be working with Plaintiff, he should be working with Balkrishnan instead. Nahata also tapped Balkrishnan to present Plaintiff's annual review to the Division's faculty—a move that Plaintiff claimed was designed to hinder his advancement in the COP. Plaintiff further accused Nahata of poaching a valuable grant.

In August 2005, Plaintiff filed a complaint detailing these and other offenses with the Dean of the COP, Dr. Robert Brueggemeier, who forwarded the complaint to an investigative

committee. Following a lengthy process of investigation, report, and appeal, it was eventually determined that relations were strained within the COP's faculty and corrective measures should be taken. Balkrishnan was singled out for his behavior and barred from tampering with other faculty members' students. Not satisfied with these results, Plaintiff filed a Charge of Discrimination with the EEOC in September 2006. The EEOC closed its file on the matter in May 2007, and in August 2007, Plaintiff filed suit in the Southern District of Ohio, charging the University with three counts of Title VII discrimination, retaliation, and discrimination by association ("2007 lawsuit").

**B.     Plaintiff's Annual Reviews**

Even as Plaintiff was participating in the dispute-resolution process at the University, he was making fitful progress towards tenure. Plaintiff's progress was reviewed annually, beginning in March 2004. In his first three reviews, Plaintiff was given high marks for his service and mediocre marks on his teaching. Plaintiff also received mediocre-to-poor reviews for his scholarship. Plaintiff, for his part, believed his reviews overlooked some scholastic achievements, and also failed to account for a lengthy illness that hampered Plaintiff's ability to work.

In early 2007, the COP conducted Plaintiff's fourth-year review, an important waypoint on the road to tenure. The review encompassed several elements. First, the Division contacted several professors from other institutions with expertise in Plaintiff's area of scholarship— pharmaceutical economics and policy. Four replied with letters giving mixed reviews of Plaintiff's scholarship and ability to obtain research funding. Dr. William Hayton, an associate dean in the COP, then prepared a letter summarizing Plaintiff's progress in teaching, scholarship, and service. Hayton noted that Plaintiff's teaching quality needed improvement, even if the

quantity of Plaintiff's teaching and advising was acceptable. Plaintiff's service was appropriate for a faculty member of his level. As for Plaintiff's scholarship, Hayton noted that Plaintiff had only five articles to his name, and all had been completed recently. Plaintiff's lack of peer-reviewed articles had been a driver of his negative marks in previous annual reviews. Hayton also stated that faculty members in the Division believed that Plaintiff's research lacked focus. Hayton further commented that Plaintiff's funding had been adequate, but it was unclear if the sources of funding were competitive.

After Hayton prepared his letter, the tenured faculty members of the COP met to discuss Plaintiff's progress. Dr. James Dalton, then the chair of the COP's tenure committee, summarized this meeting in a letter to Brueggemeier dated March 14, 2007. Most of the meeting focused on Plaintiff's research. As Dalton summarized, the faculty had a mixed response to Plaintiff's research, and thought that Plaintiff should increase the number of his peer-reviewed publications, focus his scholarship into a defined area, and gain funding from competitive sources. The faculty voted just 12 to 8 in favor of a positive fourth-year review.

Finally, Brueggemeier submitted his own recommendation to the University provost. Brueggemeier favored giving Plaintiff a positive fourth-year review, with clear expectations of improvements to be made if Plaintiff hoped to secure tenure. Brueggemeier repeated the concern about Plaintiff's late flurry of publications and the lack of focus in his work, and noted that the quality of the journals that carried his articles was low or uncertain. Similarly, it was not clear if Plaintiff's funding sources had a competitive application process. Brueggemeier concluded his letter with several expectations for Plaintiff's future research and scholarship: more peer-reviewed publications on a more regular schedule; developing a theme or focus that unites his

work; and securing research funding from federal agencies with peer-reviewed application processes.

## C. The Tenure Review Process

In the summer of 2008, preparations began for the tenure review process. The ultimate decision of whether to grant or deny tenure lay with the University's provost, Joseph Alutto. According to University policy, Alutto would make this decision based on a dossier of materials that would be assembled over the course of several months by Plaintiff and the COP. This dossier should include, among other things, a summary of the applicant's research prepared by the applicant himself; representative publications that the applicant had written while at the University; letters from external reviewers; and the recommendation of the college's faculty as to whether or not tenure should be awarded.

### 1. *External reviewers*

In August 2008, Nahata, as the chair of Plaintiff's Division, contacted Plaintiff to assemble a list of possible external reviewers. Although University procedures permitted Plaintiff to suggest names, Plaintiff declined. Moreover, Plaintiff told Nahata that the discriminatory and retaliatory conduct of Nahata and others made an unbiased tenure review process impossible. Nahata would ordinarily play an important role in preparing Plaintiff's dossier, but given Plaintiff's allegations, Nahata recused himself from the process. Dr. Robert Buerki, a tenured professor in the Division and a member of the COP's tenure committee, took over Nahata's responsibilities. Buerki assembled a group of professors in the Division to come up with a list of external reviewers. Nahata attended the meeting of these professors, but did not offer any suggestions. The meeting ended with a list of fifteen professors who were asked to provide letters of review. Only five responded initially, and their reviews were mixed.

Daniel Mullins of the University of Maryland, who had previously worked with Plaintiff, spoke positively about Plaintiff's scholarship. Plaintiff had a good balance of work, a reasonable number of publications, and Mullins forecasted that Plaintiff's rate and quality of scholarship would increase in the future. Mullins noted that Plaintiff had fewer and smaller funding grants than his peers, but chalked this up to Plaintiff's lack of experience in applying for funding, and possibly to his not needing as much funding as others in his field. Marvin Shepherd from the University of Texas also had positive things to say. According to him, Plaintiff had produced exceptional research on limited funding. Both Mullins and Shepherd recommended granting Plaintiff tenure.

John Brooks from the University of Iowa had a more measured response to Plaintiff's work. Brooks observed that Plaintiff had published several papers recently, suggesting more to come in the near future. But Brooks commented that Plaintiff's research lacked a compelling theme. Even Plaintiff's own description of his research interests could not weave its disparate topics into a single thematic arc. Brooks also believed that Plaintiff had produced too many unpublished reports compared to published peer-reviewed papers. Brooks concluded that Plaintiff's work compared favorably to his peers, but could benefit from focus.

Two of the reviewers had distinctly negative opinions about Plaintiff. Joel Hay of the University of Southern California commended Plaintiff for the number of peer-reviewed publications he had produced, but found their content to be lacking. The articles Hay had received were descriptive, not analytical, and therefore failed to show any expertise or innovation in Plaintiff's self-proclaimed area of research. David Kreling from the University of Wisconsin—one of the professors who had provided a letter for Plaintiff's fourth-year review— was even more negative. Plaintiff had no main focus to his work, and had not published in the

journals most associated with his field. The articles were not innovative or creative, and scattered over too wide of an area. In sum, Plaintiff's body of scholarship was mediocre at best—possibly below par compared to his peers.

Once these five letters had been received, Buerki wrote a letter to Dr. Anthony Young, chair of the COP's tenure committee. Buerki principally summarized the external reviewers' letters, but also briefly noted Plaintiff's record of teaching, scholarship, and service. In addition, several faculty members had discussed Plaintiff's dossier, and noted that Plaintiff had not made substantial progress in meeting the expectations set forth in Brueggemeier's fourth-year review letter. Buerki's letter included a sentence or two containing these thoughts. Nahata cosigned Buerki's letter, as the chair of Plaintiff's Division, but did not contribute to its substance.

After Buerki had completed his letter, he received two more letters from external reviewers. Abraham Hartzema of the University of Florida wrote positively about the number of publications, and believed Plaintiff's papers were clearly focused and of high quality. Hartzema also noted that few sources of funding were available in Plaintiff's area of expertise. Overall, Hartzema believed that Plaintiff had developed his own brand, been productive, and had produced important work. Caroline Gaither, of the University of Michigan, also had some positive things to say. Gaither believed that Plaintiff had produced a sufficient number of papers and that his area of research was valuable. However, Gaither found the quality of the work somewhat wanting. She noted that Plaintiff's papers were largely descriptive, but observed that Plaintiff had used a variety of methods in these papers. In the end, Gaither thought that Plaintiff compared favorably to his peers, and suggested that he select a few areas in which he could focus his research.

2.    *COP faculty vote*

With all of these materials in hand, the COP scheduled a tenure meeting and vote for December 1, 2008. In early November, Buerki, who was to present Plaintiff's application at the meeting, spoke with Plaintiff about his dossier. Buerki shared the letter he had written about Plaintiff's dossier. Plaintiff did not react positively. On November 24, 2008, he filed a motion in the 2007 lawsuit to enjoin the tenure meeting. The district court denied the motion two days later. Plaintiff then wrote a letter to Buerki dated November 29, 2008, detailing several errors and omissions Plaintiff saw in Buerki's letter. Plaintiff asked Buerki to distribute his letter at the tenure meeting. Buerki agreed to do so.

On December 1, 2008, the COP faculty met to consider Plaintiff's application for tenure. But before the faculty addressed the merits of Plaintiff's dossier, there was a lengthy discussion about the propriety of circulating the letter from Plaintiff (we know because the meeting was recorded). Some faculty members were concerned that their vote would be based on less than a full picture of Plaintiff's dossier if the letter were not handed out. Several faculty members opposed having the letter distributed on the ground that the University's procedures allowed Plaintiff to submit a rebuttal after the COP vote. Once two faculty members threatened to walk out of the meeting, the discussion moved on without Plaintiff's letter being circulated.

The substantive portion of the faculty's discussion focused on Plaintiff's publication history, funding, and the comments from the external reviewers. The opinions were mixed. Some faculty members believed that Plaintiff's funding record and publication were adequate, and that the balance of the external reviews was positive. But several faculty members felt strongly that Plaintiff's record was not up to snuff. One professor, Bob Curley, called the external letters "the least favorable I've ever seen for any candidate at any level since" he had

been at the COP. (R. 76-19, Tenure Comm. Tr., at 10,705.) Dr. Jessie Au commented that the most important metric was peer-reviewed publications, and that Plaintiff had more than enough to warrant tenure. The faculty's conversation thus mirrored the disparate opinions contained in the letters from external reviewers—ranging from positive to very negative.

Balkrishnan and Nahata made their own contributions to the meeting, chastising Plaintiff for his poor relations with them and other faculty in the COP. Balkrishnan started the meeting by asking if the faculty could face legal liability for their comments. Brueggemeier told Balkrishnan that so long as his comments stuck to the facts, the University would offer indemnification. Perhaps buoyed by this assurance, Balkrishnan proceeded to air the allegations that Plaintiff had made against him. Balkrishnan thought his colleagues should consider Plaintiff's internal complaints and EEOC claim when deciding if tenure was warranted. Au objected to Balkrishnan's characterization of Plaintiff's complaints as meritless. Later, Nahata vehemently denied Plaintiff's allegation that Nahata had misappropriated a grant.

At the end of the meeting, the faculty voted on Plaintiff's tenure application. Seven voted in favor of granting tenure, ten voted against Plaintiff, and four abstained.

### 3. *Letters from Young and Brueggemeier*

On December 9, 2008, Young sent a letter to Brueggemeier summarizing the vote and discussion that had taken place during the faculty's meeting. Young noted that the discussion was positive concerning Plaintiff's teaching and service, but that many faculty members had serious concerns about Plaintiff's scholarship. Young briefly summarized the major complaints—lack of focus, principally descriptive papers, and inadequate funding—but also stated that these concerns were not unanimously held. Young's letter also acknowledged

Plaintiff's allegations of impropriety by some faculty members and the mixed result of the investigative committee.

Next, Brueggemeier composed a letter to Alutto dated December 17, 2008. Brueggemeier explained that Plaintiff's scholarship as a whole lacked focus, and that Plaintiff's recent spate of publications was unexpected and worrying. As for funding, Brueggemeier expressed concern that Plaintiff's funding sources were not competitive or peer-reviewed. Brueggemeier thus recommended that Alutto deny tenure, in line with the faculty vote, principally based on the concerns about Plaintiff's scholarship.

4. *Plaintiff's complaints and Alutto's final decision*

Plaintiff did not take these setbacks lying down. On January 5, 2009, Plaintiff submitted a rebuttal letter (which, with exhibits, stretched to over 150 pages) for inclusion in his dossier. Plaintiff raised eight areas of concern. He claimed that Balkrishnan, aided and abetted by Nahata and Brueggemeier, had used the 2007 lawsuit as a basis for recommending denial of tenure. Nahata and Brueggemeier had allegedly poisoned the tenure process in other ways. Plaintiff claimed that Nahata had selected biased external reviewers—in particular, Kreling and Gaither. The alleged bias of these two reviewers stemmed from their relationship with Dr. Craig Pedersen, a COP professor who left the University at the end of 2008. Plaintiff asserted that Pedersen had spread vile comments about Plaintiff throughout Plaintiff's professional network, including with Kreling. Plaintiff also claimed that Nahata's letter (the one that had actually been written by Buerki) painted Plaintiff in a false light, and in any event, it was inappropriate for Nahata to allow Buerki to write it. As for Brueggemeier, Plaintiff asserted that he had inappropriately prevented the COP faculty from seeing the letter Plaintiff wrote prior to the tenure vote. Brueggemeier had also misrepresented the facts in his letter and set unreasonable

expectations in his fourth-year review of Plaintiff. Young's letter summarizing the faculty meeting was also slanted against Plaintiff. In addition, Plaintiff complained that his dossier did not include a letter from the College of Public Health, Plaintiff's scholarly collaborators, or a full list of Plaintiff's publications. Plaintiff asked Alutto to restart the tenure process and bar Balkrishnan, Nahata, and Brueggemeier from participating.

After Plaintiff's rebuttal letter was included in the dossier, the entire package was forwarded to Provost Alutto. But since the COP vote had been negative, Alutto referred the dossier to the University Promotion and Tenure Committee ("UPTC") for its review. This body of seven faculty members from across the University was headed by Dr. Carole Anderson, Dean of the College of Dentistry. The UPTC members reviewed Plaintiff's dossier and reached the same conclusion as the majority of the COP's faculty and Brueggemeier—Plaintiff's research record was too weak to recommend tenure. Five of the UPTC members voted to strongly recommend disapproval of tenure. Two members voted to weakly recommend disapproval. The UPTC also responded to the numerous allegations raised in Plaintiff's rebuttal letter and found that Plaintiff's claims either lacked merit or had no real impact on the tenure process. Anderson noted, however, that the UPTC did not have the resources to investigate these matters fully.

Finally, the decision of whether to award or deny tenure came before Alutto. Alutto reviewed Anderson's report and all of the letters in the dossier, but did not read Plaintiff's publications. On April 8, 2009, Alutto denied Plaintiff tenure.

### D.    Plaintiff's Internal Appeal

After hearing of Alutto's decision, Plaintiff filed a complaint with the University Senate Committee on Academic Freedom and Responsibility ("CAFR"), which was chaired by Dr. Marilyn Blackwell. Plaintiff's complaint essentially rehashed the allegations in his January 5,

2009 rebuttal letter. Pursuant to the University's policies, the CAFR had 60 days to investigate Plaintiff's appeal. Blackwell and the CAFR interviewed Plaintiff and received comments from Brueggemeier, Buerki, Nahata, and Young. Blackwell summarized the CAFR's findings in a letter dated June 28, 2009. The CAFR believed that five aspects of Plaintiff's tenure process violated the University's rules. The CAFR concluded that there was some reason to think that Kreling and Gaither were not in a position to provide unbiased external reviews, that the COP should have furnished Plaintiff with the list of proposed external reviewers before they were contacted for letters, that Nahata should have found someone other than Buerki to assist him in writing his letter, and that the College of Public Health should have supplied Plaintiff with a letter of evaluation. CAFR found Plaintiff's other claims without merit.

CAFR passed Plaintiff's appeal on to the Faculty Hearing Committee ("FHC"), the final level of appeal available within the University. The FHC convened a panel to hear Plaintiff's claims, and the panel met six times between August and October 2009. Plaintiff apparently believed he could not maintain his internal appeal at the same time as the 2007 lawsuit, which was scheduled to go to trial in April 2010. On October 9, 2009, Plaintiff moved to voluntarily dismiss the 2007 lawsuit. A week later, the district court granted the order and dismissed Plaintiff's case without prejudice. On October 23, 2009, the FHC found that none of Plaintiff's claims had merit. The FHC did despair at the breakdown in collegiality at the COP, and recommended that the University develop rules to account for future such situations. But Plaintiff's appeal was rejected.

## II. PROCEDURAL HISTORY

Once he had heard the final result of his internal appeal, Plaintiff returned to the EEOC. On November 2, 2009, Plaintiff completed an EEOC intake questionnaire, highlighting alleged

instances of retaliation during the tenure review process. On February 6, 2010, Plaintiff filed a charge of discrimination with the EEOC, alleging that the FHC's decision was made in retaliation for Plaintiff's protected activity. The EEOC notified Plaintiff of his right to sue on these claims in June 2010.

A month later, Plaintiff filed this suit in the Southern District of Ohio. Plaintiff reasserted the claims from the 2007 lawsuit, plus Title VII retaliation claims arising from his denial of tenure and the denial of his internal appeal. The University moved to dismiss. The district court held that Plaintiff's claims arising from any event prior to January 6, 2009 were time-barred and not subject to equitable tolling. *Seoane-Vazquez v. Ohio State Univ. (Seoane I)*, No. 10-CV-622, 2011 WL 249473 (S.D. Ohio Jan. 25, 2011). This left only Plaintiff's retaliation claims based on Alutto's denial of tenure and the FHC's denial of Plaintiff's internal appeal. After extensive discovery, the district court granted summary judgment on these final claims and reaffirmed its earlier decision concerning equitable tolling. *Seoane-Vazquez v. Ohio State Univ. (Seoane II)*, No. 10-CV-622, 2012 WL 6138661 (S.D. Ohio Dec. 11, 2012). This appeal followed.

## DISCUSSION

Title VII makes it unlawful for an employer to retaliate against an employee because the employee has engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e-3(a). Plaintiff asserts that his tenure review process was rife with retaliation for his protected activity—internal complaints and the 2007 lawsuit. The district court rejected Plaintiff's claims and granted summary judgment to Defendant on three grounds. First, the court held that Plaintiff could not sue for many of the alleged acts of retaliation because those claims were time-barred and Plaintiff could not benefit from equitable tolling. Second, the court determined that Provost

Alutto did not act with retaliatory animus when he ultimately denied Plaintiff's application for tenure. And third, the court held that Plaintiff's internal appeal of Alutto's decision was not a legally cognizable act of retaliation. Plaintiff asserts that all three of these conclusions were wrong. We address each in turn.[1]

## I.   EQUITABLE TOLLING

Before Plaintiff could initiate a Title VII suit in district court, he was required to file a charge of discrimination "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Once the EEOC decided not to pursue the claim, Plaintiff had ninety days to bring suit. *See* 42 U.S.C. § 2000e-5(f)(1). Applying these timing rules, the district court concluded that Plaintiff could not sue for any acts of discrimination or retaliation that happened before January 6, 2009. *See Seoane I*, 2011 WL 249473, at *3; *Seoane II*, 2012 WL 6138661, at *9. This cut-off barred the claims based on national-origin discrimination originally asserted in the 2007 lawsuit, as well as any acts of retaliation prior to Alutto's final decision on Plaintiff's tenure application.

Plaintiff does not argue against this conclusion. Instead, Plaintiff asserts that the court should have equitably tolled his pre-2009 claims. "Equitable tolling [] permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *E.E.O.C. v. Ky. State Police Dep't*, 80 F.3d 1086, 1095 (6th Cir. 1996) (quotation marks omitted). "We consider five factors in determining whether equitable tolling should be allowed:  1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4)

---

[1]Because we agree that equitable tolling does not apply and that Alutto's decision to deny tenure was not retaliatory, we need not address the University's other ground for affirmance on these claims—that they were not within the scope of Plaintiff's EEOC intake questionnaire or charge of discrimination.

absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 469 (6th Cir. 2003) (quotation marks and alteration omitted). Since the district court denied equitable tolling as a matter of law, we review this decision *de novo*. *See id.*

Plaintiff's theory supporting equitable tolling is hard to discern.[2] Plaintiff baldly asserts that the University delayed its resolution of Plaintiff's internal appeal in 2009, which somehow caused Plaintiff to delay filing a notice of claim with the EEOC and voluntarily dismiss the 2007 lawsuit. Even if true, these circumstances do not entitle Plaintiff to equitable tolling. Plaintiff had all the information necessary to file a timely charge with the EEOC. *Contra Dixon v. Gonzales*, 481 F.3d 324, 332 (6th Cir. 2007); *Seay*, 339 F.3d at 469–70. Plaintiff does not allege that the EEOC committed some error that rendered his claims untimely. *Contra Brown v. Crowe*, 963 F.2d 895, 898–900 (6th Cir. 1992). Plaintiff selected his course of action when faced with the competing demands of his ongoing litigation and his application for tenure. Equitable tolling is not designed to save litigants from the foreseeable consequences of their own strategic choices. Plaintiff's claims arising out of pre-2009 conduct are therefore time-barred and were properly dismissed.

## II. TITLE VII RETALIATION: ALUTTO'S DENIAL OF PLAINTIFF'S APPLICATION FOR TENURE

Next, Plaintiff argues that summary judgment should not have been granted on his claim that Provost Alutto denied Plaintiff tenure because of Plaintiff's protected conduct. We review a district court's grant of summary judgment *de novo*. *See Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 955 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there

---

[2]Plaintiff attempts to make a portion of his argument by citing the briefs he filed in the district court. We have expressly prohibited this type of advocacy. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452–53 (6th Cir. 2003).

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 157 (6th Cir. 2004).

## A. Cat's Paw Liability and But-For Causation

Plaintiff does not argue that Alutto was personally motivated by retaliatory animus when he rejected Plaintiff's application for tenure. Rather, Plaintiff asserts that Alutto was the unwitting tool of those who did harbor retaliatory animus—in other words, Plaintiff advances a cat's paw theory. The Supreme Court has recently defined this so-called "cat's paw liability" as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."[3] *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (footnote omitted).

The statute at issue in *Staub* required that the discriminatory action be a "motivating factor" in the resulting adverse employment action. *See id.* at 1190–91. We have thus directly applied *Staub* in Title VII discrimination actions, which are governed by a similar causation standard. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012). But during the pendency of this appeal, the Supreme Court established that Title VII retaliation claims require but-for causation; that is, "proof that the unlawful retaliation would not have occurred in

---

[3]Since we hold that Plaintiff cannot establish cat's paw liability, we need not consider whether and to what extent cat's paw liability fits into the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) (discussing, but not resolving, the "uneasy marriage" between *Staub* and *McDonnell Douglas*).

the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The heightened standard of causation in Title VII retaliation claims forces us to tailor the *Staub* rule to fit in this context, but the required alteration is straight-forward. If the retaliatory actions of nondecisionmakers[4] were nothing more than a motivating factor of Alutto's decision, then retaliation could not have been a but-for cause of the ultimate employment action. Therefore, we hold that cat's paw liability will lie in this case if: (1) nondecisionmakers took actions intended to deny Plaintiff tenure in retaliation for his protected conduct, and (2) those retaliatory actions were a but-for cause of Alutto's decision to deny tenure.[5] This is the same standard courts have announced when applying *Staub* to claims for age discrimination—claims that require the plaintiff to establish but-for causation. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013); *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011).

The but-for standard has an important impact in "overdetermined" cases—cases where "two forces create an injury each alone would be sufficient to cause." *Nassar*, 133 S. Ct. at 2546 (Ginsburg, J., dissenting). If a plaintiff is not required to establish but-for causation, she may still be able to recover from a tortfeasor whose conduct was sufficient, but not necessary, to

---

[4]*Staub* did not resolve whether cat's paw liability can be predicated on actions taken by co-workers, rather than supervisors. *See Staub*, 131 S. Ct. at 1194 n.4; *Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 956 (6th Cir. 2014). In the context of tenure decisions, "the line between coworker and supervisor is significantly blurred," *Seoane II*, 2012 WL 6138661, at *15, and even a few colleagues can wield dispositive influence over a plaintiff's academic future. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1327 (6th Cir. 1988). We assume in this opinion that cat's paw liability can spring from the actions of Plaintiff's colleagues in the COP. Plaintiff's claim still fails.

[5]Plaintiff points to our nonprecedential decision in *Bishop v. Ohio Department of Rehabilitation and Corrections*, 529 F. App'x 685 (6th Cir. 2013), and asserts that the proximate cause standard applies to his cat's paw theory. *Bishop* was decided less than three weeks after *Nassar*, and as a result, the panel did not have the opportunity to fully consider the interplay between *Nassar* and *Staub*.

cause her injury. *See* Restatement (Second) of Torts § 432(2). Not so where the standard is but-for causation. Following *Nassar*, "a Title VII plaintiff alleging retaliation *cannot* establish liability if her firing was prompted by both legitimate and illegitimate factors." *Nassar*, 133 S. Ct. at 2546 (Ginsburg, J., dissenting). Plaintiff's claim will therefore fail if Alutto decided to deny tenure based on factors untainted by retaliatory animus, even if Alutto's decision was also based on factors that were tainted by retaliation. So long as the untainted factors were sufficient to justify Alutto's ultimate decision, the University will be entitled to summary judgment.

## B.      Plaintiff's Dossier

Alutto made his decision to deny Plaintiff tenure based on significant portions of Plaintiff's dossier: the fourth-year review evaluating Plaintiff's progress as a professor, the internal and external review letters, Plaintiff's January 5, 2009 letter pointing out the flaws in the tenure review process, and the UPTC report. For Plaintiff to prevail, he must establish a genuine issue of fact that most, if not all, of these portions of his dossier were tainted. He cannot.

### 1.      *Fourth-year review*

The record reveals that Plaintiff's fourth-year review was not a vehicle for prohibited retaliation. The fourth-year review was something of a mini-tenure review with a similar number of steps. For the first step, Dr. William Hayton, an Associate Dean at the COP, prepared a letter summarizing Plaintiff's teaching, scholarship, and service. Hayton criticized the amount and quality of Plaintiff's scholarship, and noted that it was unclear if Plaintiff's funding came from peer-reviewed sources. Hayton recommended a positive fourth-year review, but noted that "issues of significant concern require attention and should be resolved by the time of evaluation for tenure." (R. 38-8, Fourth-Year Review, at 1583.) Plaintiff does not accuse Hayton of

harboring a retaliatory animus—important because Hayton's critiques were echoed again and again by internal and external reviewers of Plaintiff's record.

With Hayton's letter and letters from four outside reviewers in hand, the COP faculty discussed and voted on Plaintiff's record. Twelve faculty members voted for a positive review; eight voted no. Dr. James Dalton, the Chair of the Tenure Committee (and another person whom Plaintiff has not accused of harboring a retaliatory animus), summarized the faculty's discussion in a letter to Brueggemeier dated March 14, 2007. The letter noted that the faculty's discussion of Plaintiff had been mixed, and that even though the vote had been positive, several areas required improvement before tenure review. Like Hayton, the faculty believed that Plaintiff needed to publish more research in a clearly defined area of specialization. Also like Hayton, the faculty believed that Plaintiff should work to obtain more funding from competitive funding sources.

Finally, Brueggemeier wrote his own letter to the University Provost summarizing Plaintiff's achievements. Brueggemeier's recommendations were essentially indistinguishable from those of Hayton and the COP faculty—he recommended a positive fourth-year review "with very clear expectations for critical improvements in teaching and research prior to the tenure and promotion decision." (*Id.* at 1573.) Brueggemeier parroted the suggestions for Plaintiff's future research and, like Hayton and the faculty, stressed the need to obtain funding from competitive, peer-reviewed sources. However, unlike Hayton or the faculty, Brueggemeier also urged that these sources of funding should be federal agencies. Plaintiff points out that federal funding, which is considered the gold standard in the field, constitutes an unreasonable expectation for a young professor. Indeed, Plaintiff's peers at the COP were not required to gain federal funding at similar stages of their career.

But Plaintiff overstates matters when he attempts to cast Brueggemeier's push for federal funding as evidence of retaliation. Brueggemeier's letter was almost entirely consistent with the other evaluations that, combined, made up Plaintiff's fourth-year review. Brueggemeier's letter also meshes with the numerous other reviews Plaintiff received during his time at the COP. Plaintiff's research was repeatedly deemed either unsatisfactory or in need of improvement. Only in his 2007 and 2008 reviews did Plaintiff receive "good/excellent" marks on his research. There is no meaningful distinction between Brueggemeier's letter and the opinions of Hayton, Dalton, the external reviewers, and the COP faculty. Plaintiff does not argue that Hayton, Dalton, and many of the COP faculty members were attempting to retaliate against him. We fail to see how Brueggemeier's substantively identical letter could have been a vehicle for retaliation.

2. *External review letters*

Next, Plaintiff cannot show that the external review letters were products of retaliation. For these letters to assist Plaintiff, he must show that nondecisionmakers at the COP selected Plaintiff's external reviewers with the intent that those reviewers would report negatively about Plaintiff, perhaps because the external reviewers were biased against Plaintiff, or perhaps because they were invariably scathing in their assessments of others' work. But there are simply too many weak links in this causal chain.

Buerki and the other COP faculty members who had the responsibility of choosing external reviewers selected fifteen scholars. Only seven responded, and most of them wrote positively. In other words, Plaintiff's colleagues only managed to select three negative reviewers, at most, out of fifteen—hardly circumstantial evidence of retaliatory intent. Plaintiff asserts that the most negative external reviewers were personally biased against Plaintiff because of their association with Plaintiff's former colleague Dr. Craig Pedersen. But Plaintiff has not

produced any evidence, apart from his own speculation, that either the external reviewers were in fact biased, or that the COP faculty that selected them knew of this hypothetical bias. Furthermore, Plaintiff had the opportunity to select his own external reviewers, who presumably would have had positive things to say. Plaintiff passed up the chance to help himself. Finally, Plaintiff contends that the selection of reviewers violated University rules, since Plaintiff was not told who the reviewers were before they were selected. The University's rules did not require this procedure; they only suggested it.

The most scathing external review letters did nothing more than parrot the scathing reviews that Plaintiff had received internally from numerous sources over several years. Plaintiff cannot point to substantive or procedural issues showing that the external letters were intended by Plaintiff's colleagues to ensure that he did not receive tenure in retaliation for protected conduct.

### 3. *Internal review letters*

Nor can Plaintiff show that the internal letters from Buerki, Young, and Brueggemeier were tainted by retaliatory animus. Buerki's October 10, 2008 letter simply summarized Plaintiff's accomplishments in teaching, scholarship, and service, plus the letters that had been received from external reviewers. The letter also included opinions about Plaintiff from five other faculty members, including one who collaborated extensively with Plaintiff. Plaintiff cannot point to evidence—as opposed to speculation—suggesting that these faculty members were biased against him. Young's letter is also bereft of retaliatory intent. Like the Buerki letter, Young simply summarized the opinions of others—in Young's case, the COP faculty at the tenure meeting. Plaintiff argues that the retaliatory remarks Balkrishnan made during the meeting tainted the proceedings and therefore Young's letter. But while Balkrishnan's remarks

were indisputably retaliatory, Plaintiff has not proffered any evidence that they altered the vote of a single faculty member. Finally, Brueggemeier's December 17, 2008 letter does not reveal retaliatory animus. Brueggemeier's review of Plaintiff's teaching and service was generally positive, and his critiques of Plaintiff's research mirrored those that had been levied against Plaintiff since his fourth-year review. Brueggemeier concluded that Plaintiff's funding had been inadequate—not because the funding sources were not federal agencies, but because they were not obviously peer-reviewed.

## C. Retaliation Was Not a But-For Cause of Alutto's Decision

After all of Plaintiff's invective, he cannot show that any significant portion of his dossier was tainted by retaliatory animus. Since the factors that contributed to Alutto's decision were not retaliatory, it follows that Alutto's decision was not caused by retaliatory actions of nondecisionmakers. *See Staub*, 131 S. Ct. at 1193.

The bevy of collateral arguments Plaintiff presents cannot distract us from this conclusion. Plaintiff first asserts numerous procedural errors in the tenure review process, but even if the COP failed to follow some University procedures, these errors did not affect the elements of the dossier that actually influenced Alutto's decision. Second, Plaintiff's argument that Alutto was not qualified to review Plaintiff's dossier is not well taken. The University has adopted tenure procedures that apply universally to a broad spectrum of academic disciplines. We will not pass judgment over the propriety of this system of academic review as a whole in this single case. Third, the district court's treatment of Plaintiff's proffered expert does not require reversal. Plaintiff does not argue that the district court made any error of law by excluding admissible portions of the expert's testimony. Plaintiff simply asserts that the district court failed to properly consider the expert's testimony. Even if Plaintiff's contention were

correct, it is moot. *See Ralph ex rel. Ralph v. Nagy*, 950 F.2d 326, 329 (6th Cir. 1991). We have fully considered the expert report and deposition. Neither supports reversing the district court's judgment.

Finally, Plaintiff relies heavily on our opinion in *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988), but this case does not ultimately support Plaintiff. The plaintiff in *Gutzwiller* was a female professor of classics at the University of Cincinnati who was on the tenure track. *See id.* at 1320. She received high marks on her teaching and committee work, and had a book accepted for publication, but the plaintiff's male superiors placed higher demands on her scholarly output. *See id.* at 1320–21. When the plaintiff came up for tenure, her superiors rejected most of her suggested external reviewers and selected some that the plaintiff explicitly warned against. *See id.* at 1322. The department then voted to deny tenure. *See id.* at 1322–23. The dean, however, noted that most of the evaluations of the plaintiff's scholarship had been laudatory and voted to approve tenure. *See id.* at 1323. The provost ultimately overruled the dean and denied tenure after considering more evidence from the department. *See id.* The plaintiff sued numerous members of the University, including individual members of the Classics Department who considered her application. A jury found that two of the plaintiff's supervisors in her department had denied her tenure because of her sex. *See id.* at 1324. There was no evidence that these superiors had required male professors to publish two books before receiving tenure—in fact, the plaintiff had met or exceeded the number of publications of other professors who received tenure. *See id.* at 1326. Most damning, one supervisor claimed that the plaintiff's work was not "rich enough or productive enough," but "the evidence showed that he had *not even read* [the plaintiff's] manuscript at the time he informed her of th[e] additional requirement." *Id.*

If Plaintiff's claims for pre-2009 conduct were still viable, *Gutzwiller* would have relevance. But *Gutzwiller* has nothing to say about applying the elements of a cat's paw claim to a tenure decision. Plaintiff points to the parallel between the supervisor in *Gutzwiller*, who did not read the plaintiff's research, and Alutto, who likewise did not to read Plaintiff's articles. In *Gutzwiller*, this evidence was used to support the conclusion that the supervisor was motivated by discrimination. Plaintiff has levied no such charge against Alutto. Since Plaintiff argues that Alutto was simply a cat's paw for the retaliation of others, Alutto's own motivations are irrelevant.

One teaching of *Gutzwiller* is relevant to this case. We stressed in *Gutzwiller* that a court must not sit as a "super tenure committee." *Id.* at 1326 (quotation marks omitted). Indeed, "federal courts have traditionally been wary of interfering with academic tenure decisions." *Ford v. Nicks*, 866 F.2d 865, 875 (6th Cir. 1989). In order to stave off summary judgment, it is not enough for Plaintiff to show that he should have received tenure. Plaintiff must create a genuine issue of fact that retaliation was a but-for cause of Alutto's denial of tenure. The University's tenure procedures are lengthy, detailed, and stringent. They attempt to ensure that invidious or petty motives of individual faculty members do not affect the University's ultimate decision concerning the decades-long commitment it makes to tenured faculty. Conspiratorial theories based on little more than speculation cannot save a claim from summary judgment. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). Plaintiff cannot show that such an extensive conspiracy to deny him tenure existed.

## III. TITLE VII RETALIATION: PLAINTIFF'S INTERNAL APPEAL

Finally, I turn to Plaintiff's retaliation claim arising out of the FHC's dismissal of Plaintiff's internal appeal. The district court held that the denial of an internal appeal from an adverse employment action was not a cognizable act of retaliation. *See Seoane II*, 2012 WL

6138661, at *10–13. This legal conclusion, which we review *de novo*, *see Doe v. Salvation Army in the U.S.*, 531 F.3d 355, 357 (6th Cir. 2008), is wrong.

The anti-retaliation provision of Title VII prohibits "discriminat[ing]" against an employee because that employee had engaged in protected conduct. 42 U.S.C. § 2000e-3(a). An employer's action constitutes discrimination if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). As a result of this standard, "a plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007).

Once Alutto denied Plaintiff's application for tenure, Plaintiff sought relief through the University's internal appeals process. Plaintiff claims that he was denied the benefit of these procedures—that the FHC dismissed his appeal in retaliation for Plaintiff's internal complaint and federal lawsuit. In effect, Plaintiff argues that the FHC failed to investigate his complaint concerning the tenure review process, which Plaintiff claimed was rife with discriminatory and retaliatory animus. A failure to investigate a complaint can constitute an act of retaliation under some circumstances—for example, "if the failure is in retaliation for some separate, protected act by the plaintiff," apart from the uninvestigated complaint itself. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 722 (2d Cir. 2010) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219–20 (D.C. Cir. 2006)). Plaintiff has alleged precisely this type of conduct. Plaintiff asserts that the FHC failed to investigate his complaint in retaliation for Plaintiff's earlier complaints about national-origin discrimination, plus the 2007 lawsuit. Plaintiff's accusation is of particular

note since we have stressed the importance of internal appeal processes in the context of university tenure decisions. *See Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999), *overruled in part by White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004) (en banc). At the very least, there is a factual dispute as to whether a tainted internal appeal "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (quotation marks omitted).

The district court reached the opposite conclusion based on its finding that the FHC did not have the power to order a new tenure process. The court believed this to be the relevant question based on two cases that addressed claims arising out of grievance procedures following denial of tenure: *Delaware State College v. Ricks*, 449 U.S. 250 (1980), and *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir. 1992). The grievance procedures in these cases were purely remedial, and therefore their outcomes were not independently cognizable employment actions. *See Ricks*, 449 U.S. at 261; *Lever*, 979 F.2d at 556. But neither of these cases involved a claim for Title VII *retaliation*, and neither employed the standard from *Burlington Northern*. *See Ricks*, 449 U.S. at 254; *Lever*, 979 F.2d at 553. "The 'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race discrimination claim." *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014). As a result, neither *Ricks* nor *Lever* provides relevant instruction for this case.

Despite the district court's legal error, a majority of this panel affirms the court's judgment on the basis that Plaintiff failed to develop this argument either below or on appeal. While I disagree with this assertion, I note that the panel's majority raises no dispute with the lead opinion's legal analysis of Plaintiff's claim. Contrary to the majority's holding on this

issue, I would therefore remand to allow the district court to consider whether the retaliatory acts of nondecisionmakers were a but-for cause of the FHC's denial of Plaintiff's internal appeal.

## CONCLUSION

For the reasons set forth above and in the opinion that follows, we **AFFIRM** the district court in full.

**Alice M. Batchelder, Circuit Judge, concurring in part and dissenting in part.**

I concur in this opinion except for Part III of the DISCUSSION section, "Title VII Retaliation: Plaintiffs' Internal Appeal." The Appellant devotes one brief and cursory paragraph of his brief, to what he referred to in his factual statement as "Item 8" of OSU's allegedly discriminatory actions. He repeats this cursory paragraph, without any further development or argument, in his reply brief. It is this item that the majority opinion frames as whether the denial of an internal appeal can be a cognizable act of retaliation under the new standard for an adverse material action in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). But Appellant never developed this argument in the district court or on appeal, and thus it is waived. As we have repeatedly held, "[w]e require parties to develop their arguments in a non-perfunctory manner at the risk of having them deemed waived." United States v. Catlan, 499 F.3d 604, 606 (6th Cir. 2007). We have cautioned that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal quotations and citation omitted); see also United States v. Robinson, 390 F.3d 853, 885-86 (6th Cir. 2004); United States v. Reed, 167 F.3d 984, 993 (6th Cir. 1999) (invoking this rule to deem an issue forfeited). In my view, because Appellant failed to raise and develop the issue, he has waived it.