JONES, JUDGE:
*80 Tonya Lindsey has appealed from the orders of the Fayette Circuit Court granting summary judgment and dismissing her claims for violations under the Kentucky Civil Rights Act, including both race and gender discrimination under KRS 2 344.040 and retaliation under KRS 344.280. In addition to alleging that the circuit court erred in granting summary judgment and abused its discretion in evidentiary rulings, Lindsey argues that the circuit court judge should have recused or been disqualified from presiding over the case. After careful review, we affirm the circuit court's order regarding discrimination and find no error in the circuit court judge's refusal to recuse; however, we reverse the circuit court's order regarding retaliation and remand Lindsey's retaliation claim for further proceedings.
I. BACKGROUND
In 1990, Lindsey, an African-American woman, began working at the University of Kentucky ("UK").[3] Lindsey alleges that during her tenure at UK she was passed over for promotion to the Clinical Coordinator position on three separate occasions. Lindsey asserts that UK's decisions not to promote her were impermissibly driven by the race and gender biases of her supervisors in violation of Kentucky's Civil Rights Act.
The first time Lindsey applied to be Clinical Coordinator was in 1999. Lindsey testified in her deposition that she was interviewed for the position, but another woman, Denise Holder ("Holder"), who was not African-American, got the position. Lindsey testified that she talked to the chief physician in the department about not being promoted, but she did not bring up race. Lindsey also talked to Terry Allen ("Allen"), the head of the equal opportunities office at UK. She told him that she felt qualified for the Clinical Coordinator position based upon the job description; however, she felt like she had not been offered the job due to her gender and race. Lindsey believed that she was more qualified than Holder, given that Lindsey had her certified nursing assistant license.
When the Clinical Coordinator position opened up again on February 25, 2002, Lindsey testified in her deposition that she again applied for the position. But the records reviewed by Catherine Lasley-Employment Manager of UK's Human Resources ("HR") office-indicate that Lindsey did not actually apply for the position at that time. Lindsey said that she had asked Julia Snow ("Snow"), who was the administrative staff officer for the department,[4] about interviewing for the position *81 and that Snow told her that she would not have to interview for the position since she was already employed in the department. As it turns out, however, Snow was not in charge of promoting someone to that position. Subsequently, Lindsey was never interviewed, and the position, ultimately, was given to Gary Broome ("Broome"). Broome was not working for UK at the time he was awarded the position.
Lindsey testified that she applied for the Clinical Coordinator position a third time in October of 2003.[5] However, the application process was clouded by Broome's unusual resignation. Despite being on an improvement plan, such that Snow had been coaching Broome to better manage the clinic, Broome told UK that he was going to resign from his Clinical Coordinator position. Consequently, UK posted the position online, and Lindsey applied for the position. But Broome changed his mind about resigning before UK hired anyone. Broome asked to remain Clinical Coordinator, and UK obliged, hoping that Broome's performance would improve. Accordingly, because Broome did not resign, UK took down its online posting.
A few months later, however, after Broome accepted a different position at UK, the Clinical Coordinator position was once again opened. UK posted the position online for seven days in January of 2004, requiring a second application from Lindsey to be considered for the position. But Lindsey did not see the January 2004 posting and, therefore, did not submit an on-line application. Instead, Lindsey learned at an informal staff meeting that Tracey Eades ("Eades"), a white male co-worker who learned about the reposted position from Snow, was temporarily filling the Clinical Coordinator position until a new Clinical Coordinator was hired. At that meeting, Lindsey asked Snow why Eades was temporarily filling the position, and Snow allegedly responded by telling Lindsey "to understand that [Lindsey's] a black woman, and [she] cannot have a management position." Snow allegedly explained that Lindsey was from a different world and that black women are "aggressive or dominant, assertive."
Snow, however, denied making those remarks in her deposition. Snow claimed that, in trying to establish a rapport with Lindsey, she had told Lindsey about her daughter's coach who was a "wonderfully assertive" black woman. Snow claimed that she admired her daughter's coach and that she told Lindsey that she wanted to be more assertive and direct in the way she communicated, like Lindsey, her daughter's coach, and Jocelyn Hill, a black employee in the department. Snow denied ever using the word "aggressive[.]"
Later that day, after the informal staff meeting, Snow asked Lindsey if she was still interested in the Clinical Coordinator position and then informed Lindsey that the position had been posted again but taken down. Lindsey later learned that the position had ultimately been given to Eades.
At a meeting on March 10, 2004, Allen addressed Snow's remarks to Lindsey as well as Eades's previous remark to Lindsey, which was prior to Eades's position as Clinical Coordinator. As co-workers, Eades had asked Lindsey what she would think if someone told her, "I haven't seen you in a coon's age." Eades explained that he had heard the phrase and had considered using it colloquially, but he knew the word "coon" was a derogatory term towards African-Americans, *82 so he decided to ask Lindsey, whom Eades considered a friend, if "coon's age" was similarly derogatory and if she would be offended if someone used that phrase when speaking to her. Eades thought that Lindsey would give him an honest answer. And, Lindsey did: she told Eades that the phrase was offensive. Although Eades did not think Lindsey was offended by his question at that time, Eades later found out, as Lindsey's supervisor, that she had been offended.
At the meeting on March 10, 2004, Lindsey said that the remarks by Snow and Eades had created a hostile working environment. Furthermore, Lindsey alleged that she had been discriminated against; Lindsey alleged that she had been repeatedly passed over for promotion to the Clinical Coordinator position for race-based and gender-based reasons. Lastly, she requested that no one retaliate against her because of her complaints.
On April 9, 2004, Lindsey filed a Stage 1 grievance, alleging illegal acts of discrimination and retaliation. Lindsey alleged, in her grievance, that Eades had disciplined Lindsey with a written warning for refusing to setup a proctology room, which Dr. Curtis J. Clark witnessed and testified about in a deposition, in retaliation for Lindsey's accusations of discrimination at that meeting on March 10, 2004. Subsequently, at a meeting on April 23, 2004, Lindsey allegedly made inappropriate comments to Eades about how he was able to apply for and receive the Clinical Coordinator position, causing Eades to formally warn Lindsey about her behavior.
On August 31, 2005, Lindsey filed her suit, seeking damages for the alleged discriminatory and retaliatory conduct mentioned above.[6] As defendants, she named the Board of Trustees of UK and Eades; UK filed an answer to the complaint, disputing Lindsey's allegations. About a year after the original complaint was filed, Lindsey moved for leave to file a first amended complaint to add Lisa Turner ("Turner") as a defendant. Turner was Lindsey's supervisor at that time because Eades had left UK for another job. Lindsey alleged that Turner both retaliated and discriminated against Lindsey. UK and Turner, by special appearance, objected to Lindsey's motion, noting that Lindsey had not made a showing to permit the court to conclude that justice required the amendment. Lindsey had not identified Turner as the perpetrator of any act of discrimination or retaliation during any discovery, including her deposition or interrogatory responses, prior to filing the motion. The following year, after Lindsey included more specific facts in her amended complaint to add Turner as a defendant, the circuit court granted Lindsey's motion to file an amended complaint.
Lindsey testified about Turner at a deposition, explaining why she wanted to name Turner as a defendant in her lawsuit. Lindsey believed that Turner had wrongfully disciplined her because the disciplinary actions taken against her were, in her opinion, a cover up for racial discrimination following the filing of her lawsuit against UK. Although Lindsey had not discussed with Turner the fact that she had filed a complaint against Eades for making racially insensitive statements or that Snow had made racially insensitive comments to her, Lindsey believed that Turner knew about her past complaints. Lindsey based this belief on comments that Turner had made to her. For instance, Turner mentioned to Lindsey that *83 someone told Turner that Lindsey was not a good worker.
At her own deposition, Turner explained that, upon starting her job as Clinical Nurse Manager for the clinic improvement team, a co-worker of Lindsey's, Mary Lawson, informed Turner that there was a "discrepancy" between Lindsey and UK. Snow, in turn, allegedly told Turner that Lindsey was not a desirable employee and "further instructed [Turner] to closely scrutinize [Lindsey] and document her performance." Even though Turner testified that she thought someone should have told her about Lindsey's lawsuit against the department, Turner admitted that she did not know about Lindsey's lawsuit until after Turner had recommended Lindsey's firing. This, it turns out, was by design. Snow, at her deposition, stated that UK made the decision to not inform Turner of Lindsey's lawsuit when hiring Turner. UK wanted to give Turner a "clean slate[.]" UK wanted Turner's fresh perspective to identify, and/or verify, all of the problems in the clinic. UK did not want to simply tell Turner about the problems in the clinic.
After Turner began the job in January of 2006, she identified several problems with Lindsey's job performance: issues completing the fee sheets and handling cash deposits correctly on a daily basis, having a high number of open encounters, and having a lower number of answered telephone calls than she should have had as the secondary phone answerer. Turner met with Lindsey in January of 2006 to discuss matters, including Lindsey's job description and how much time she was to spend per day on her job responsibilities.[7]
Sometime after mid-February of 2006, Turner again met with Lindsey to discuss her performance evaluation for 2005, which had been completed by Snow and Laura Williams. The evaluation showed that Lindsey struggled with fees that generated error messages, that she struggled with handling open encounters, and that the number of appointments she scheduled per month was low. Significantly, the evaluation stated: "It does not appear that her performance is meeting the standards of the department." Lindsey, however, responded to this evaluation in a handwritten note, writing that her duties as well as the processes and procedures had changed a number of times during 2005 and that expectations set by different individuals were contradictory and confusing.[8]
To assist Lindsey with her responsibilities, Turner retrained Lindsey in cash handling, assisted her in completing the fee sheets, and had another employee train her on coding. Snow, however, allegedly told Turner to stop helping Lindsey; and Turner obliged, allegedly feeling pressured by UK to do so. Turner went on to discipline Lindsey for sending excessive emails regarding issues related to the fee sheet protocol that Turner claimed had been clarified. After that, Turner met with UK's HR and recommended to HR that Lindsey be terminated. No one disagreed with Turner's recommendation. Therefore, on September 14, 2006, Lindsey was involuntarily terminated for inappropriate or unsuitable job performance.
*84 In April of 2010, after years of discovery and depositions, UK filed a motion for summary judgment seeking dismissal of Lindsey's claims. In a separate memorandum, UK argued that the undisputed material facts made it impossible for Lindsey to establish the essential elements of her discrimination and retaliation claims.[9] Moreover, UK claimed that it had legitimate, non-retaliatory bases for giving Lindsey written and oral warnings. Lindsey objected to UK's motion and argued that Snow's words provided direct evidence of discriminatory animus. The circuit court entered an opinion and order on November 2, 2010, granting UK's motion for summary judgment. Lindsey moved the circuit court to alter, amend, or vacate its order pursuant to CR 10 59.05, but the circuit court did not grant Lindsey's motion.
In January of 2011, new counsel was substituted for Turner. The following month, Turner moved for leave to file a cross-claim against UK pursuant to CR 13.07. After Lindsey's termination, UK had demoted Turner from her Clinical Nurse Manager position to a research position, and then UK eliminated that research position. In her cross-claim, Turner alleged that when she began working for UK she was pressured by her superiors to closely scrutinize Lindsey so that Lindsey could be fired. Turner testified and plead that she gave in to UK's pressure because she feared for her job. Nevertheless, according to Turner's cross-claim, UK still retaliated against Turner by demoting, harassing, and terminating her after UK fired Lindsey.
In March of 2011, the circuit court granted Turner's motion for leave to file a cross-claim and granted Lindsey's motion to supplement her response to the motion for summary judgment. The circuit court also vacated the order granting summary judgment in light of the new evidence set forth in the cross-claim. After additional discovery, UK moved the circuit court to reinstate its previous opinion and order granting summary judgment, pointing to evidence that Turner was terminated for clocking in and then leaving work while still on the clock. At a hearing on January 27, 2012, the circuit court orally denied the motion to reinstate, reopened discovery for sixty days, and permitted Lindsey to depose Turner on the issues raised in her cross-claim.
Sometime thereafter, Turner dismissed her cross-claim against UK. After the dismissal, Lindsey deposed Turner. This caused a dispute between the parties regarding whether communications between UK's former counsel, Edmund Benson, and UK regarding Turner's employment as well as her involvement in Lindsey's litigation were protected by the attorney-client privilege. By a protective order entered May 7, 2012, the circuit court precluded Lindsey from deposing UK's former counsel pending further order of the court. Lindsey then moved to depose UK's former counsel by avowal, claiming that the services of UK's former counsel were in furtherance of a fraud-an exception to the attorney-client privilege. The circuit court denied Lindsey's motion by order entered July 3, 2012.
In September of 2012, UK filed a renewed motion for summary judgment, arguing that Lindsey's termination was the result of her performance issues-not her grievance and lawsuit. Turner filed a similar motion as to the retaliation claims against her. In October of 2012, Lindsey *85 moved the court to vacate its July 3, 2012, protective order to permit Lindsey to depose Edmund Benson, UK's former counsel. On November 13, 2012, the court orally denied the motion to vacate the protective order and took the summary judgment matter under advisement. After Lindsey again attempted to obtain Benson's testimony by avowal, pursuant to KRE 11 103 this time, the circuit court denied Lindsey's motion on May 13, 2013.
In December of 2014, Lindsey filed her own motion for summary judgment, arguing that direct evidence of discriminatory animus existed regarding Lindsey's failed promotions. Both UK and Turner objected to the motion. In July of 2015, Lindsey moved the circuit judge to recuse himself from the case pursuant to KRS 26A.015(2)(a) based upon the circuit judge's previous ruling on the motion for summary judgment in favor of UK, which Lindsey alleged biased the judge in favor of UK. The circuit court orally denied this motion at a hearing on July 17, 2015. Lindsey next filed an affidavit pursuant to KRS 26A.020 to the Chief Justice of the Supreme Court of Kentucky, seeking recusal and the appointment of a special judge. The Chief Justice denied Lindsey's motion for disqualification on July 30, 2015.
On November 4, 2015, the circuit court entered an opinion and order granting UK's renewed motion for summary judgment, reasoning that Lindsey had failed to meet the requirements for a discrimination claim under the McDonnellDouglas[12] framework and that Lindsey had failed to meet the requirements for a retaliation claim under the modified McDonnell Douglas framework. Furthermore, by order entered November 10, 2015, the circuit court amended its previous opinion and order to clarify that all renewed motions for summary judgment by the defendants were granted and that the amended judgment was final and appealable.
On November 13, 2015, Lindsey moved the circuit court to alter, amend, or vacate its amended judgment pursuant to CR 59.05 to correct the date of the prior opinion and order and to identify the renewed motions for summary judgment it was granting. By separate motion filed the same day, Lindsey moved the court to alter, amend, or vacate the November 4, 2015, opinion and order. A hearing was scheduled for November 20, 2015, to address Lindsey's motions. But on November 18, 2015, Lindsey filed a second affidavit pursuant to KRS 26A.020, seeking recusal of the circuit judge and the appointment of a special judge. This affidavit was forwarded to the Chief Justice on January 13, 2016, and by order entered January 21, 2016, the Chief Justice denied the motion for disqualification. Lindsey then re-noticed her CR 59.05 motions on March 4, 2016. On March 21, 2016, the circuit court denied Lindsey's CR 59.05 motions. Lindsey then appealed to this court on April 15, 2016.
II. ANALYSIS
A. Timeliness of Appeal
UK argues, in its brief, that Lindsey's appeal should be dismissed as untimely. Although Lindsey timely filed both her CR 59.05 motion to alter, amend, or vacate the circuit court's opinion and order entered November 4, 2015, and her CR 59.05 motion to alter, amend, or vacate the circuit court's amended opinion and order entered November 10, 2015, UK argues *86 that Lindsey did not properly re-notice her motions for a hearing.
After Lindsey filed her motions, a hearing was scheduled for November 20, 2015. But, two days before the scheduled hearing date, Lindsey filed a second affidavit pursuant to KRS 26A.020, seeking recusal of the circuit judge and the appointment of a special judge, which stayed the action. "[U]nder the recusal remedy set out in KRS 26A.020(1), the [circuit] judge is not to make the recusal determination and the case is to be held in abeyance pending the Chief Justice's determination." Diaz v. Barker , 254 S.W.3d 835, 838 (Ky. App. 2008) (citation omitted). Subsequently, once the Chief Justice denied Lindsey's motion for disqualification in an order entered January 21, 2016, the case was no longer held in abeyance. Accordingly, UK argues that Lindsey should have re-noticed her motions within ten days of the Chief Justice's denial. But because Lindsey did not re-notice her motions until March 4, 2016, UK asserts that Lindsey's motions were untimely, making her subsequent appeal to this court untimely.
We disagree. Lindsey's CR 59.05 motions were timely filed. UK has cited to no authority, and we have found none, to support its argument that Lindsey had to re-notice her CR 59.05 motions. CR 59.05 provides: "[a] motion to alter or amend a judgment, or to vacate a judgment and enter a new one, shall be served not later than 10 days after entry of the final judgment." Lindsey's motions were served within 10 days of entry of the final judgment. Moreover, Lindsey timely appealed to this court. The circuit court denied Lindsey's CR 59.05 motions on March 21, 2016. Lindsey appealed to this Court on April 15, 2016, which was within thirty days of the circuit court's final judgment on March 21, 2016. See Parker v. Commonwealth , 440 S.W.3d 381, 384 (Ky. 2014) ("To provide clarification, the time period for filing a notice of appeal is commenced upon the disposition of an appropriately filed motion that a final judgment be vacated, altered, or amended under CR 59.05.").
B. Disqualification
On appeal, Lindsey argues, once again, that the circuit judge was biased and should have recused. Lindsey claims that the circuit judge should not have ruled on the defendants' renewed motion for summary judgment for the following reasons: the circuit judge granted summary judgment in 2010 in favor of the defendants; the circuit judge was aware that Lindsey's attorney had moved for the recusal of another circuit court judge in Fayette County in an unrelated case; the circuit judge played football for UK while in college; and the circuit judge had not promptly disposed of the case.
KRS 26A.015(2) provides: "Any ... judge of the Court of Justice ... shall disqualify himself in any proceeding ... [w]here he has a personal bias or prejudice concerning a party ... or has expressed an opinion concerning the merits of the proceeding[.]" "The general rule, as articulated by the Sixth Circuit Court of Appeals, is that '[a] predisposition acquired by a judge during the course of the proceedings will only constitute impermissible bias when it is so extreme as to display clear inability to render fair judgment.' " Alred v. Commonwealth, Judicial Conduct Comm'n , 395 S.W.3d 417, 433 (Ky. 2012) (citing United States v. Howard , 218 F.3d 556, 566 (6th Cir. 2000) (citation and internal quotation omitted)). Here, Lindsey has made no showing whatsoever that the circuit judge manifested a clear inability to render a fair judgment. Moreover, "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its *87 remand, and to sit in successive trials involving the same defendant." United States v. Liteky , 510 U.S. 540, 551, 114 S.Ct. 1147, 1155, 127 L.Ed. 2d 474 (1994). Similarly, it has long been regarded as normal and proper for a judge to sit in successive motions for summary judgments involving the same defendant.
There is no legal authority or precedent that a judge may not make further rulings in a case once a summary judgment is granted but then vacated and reversed. As UK argues in its brief: "If that were the law, every time a case was reversed on appeal, a new [j]udge would have to be appointed to handle the remanded case."
We find no error in the circuit judge's refusal to recuse. However, we decline UK's request that we impose sanctions on Lindsey's counsel for seeking recusal.
C. Deposition of UK's former counsel
Lindsey argues, on appeal, that the circuit court erred when it denied her request to depose UK's former counsel, Edmund Benson, by avowal. Lindsey attempts to obtain his testimony on the theory that UK's former counsel fraudulently concealed the existence of Lindsey's lawsuit from Turner so that UK could not be held liable for its "pre-planned" termination of Lindsey. Lindsey argues that the attorney-client privilege between UK's former counsel and UK does not apply in this case, citing the KRE 503 exception involving communications in furtherance of a fraud. In response, UK and Turner argue that the attorney-client privilege does apply in this case.
We hold that the attorney-client privilege applies. There is no evidence of a legal fraud being committed. There is simply testimony from Snow that UK's former counsel allegedly advised Snow not to discuss Lindsey's lawsuit against UK with anybody. Therefore, we recognize, as the circuit court did, that the information Lindsey seeks to obtain through deposition is already in the record through Snow's testimony, and such information does not suggest that a legal fraud was being committed. Moreover, the fact that such information is already in the records means that denying Lindsey's request to obtain testimony by avowal does not affect her substantial rights as a party. See KRE 103(a). Accordingly, we see no reason to waive the attorney-client privilege in this case. Lastly, we note that Snow was not a representative of UK for purposes of KRE 503(a)(2) and, therefore, could not waive the privilege on behalf of UK, despite Lindsey's claim to the contrary.
D. Summary Judgment
Lindsey argues that the circuit court erred in granting summary judgment on her failure to promote claim due to gender-based and race-based discrimination and on her retaliation claim. Our standard of review on appeal from a summary judgment is well-settled in the Commonwealth. "The standard of review on appeal when a trial court grants a motion for summary judgment is 'whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.' " Lewis v. B & R Corp. , 56 S.W.3d 432, 436 (Ky. App. 2001) (citing Scifres v. Kraft , 916 S.W.2d 779, 781 (Ky. App. 1996) ; Palmer v. International Ass'n of Machinists & Aerospace Workers , 882 S.W.2d 117, 120 (Ky. 1994) ; CR 56.03 ). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo. " Lewis , 56 S.W.3d at 436 (citing Scifres , 916 S.W.2d at 781 ;
*88 Estate of Wheeler v. Veal Realtors and Auctioneers, Inc. , 997 S.W.2d 497, 498 (Ky. App. 1999) ; Morton v. Bank of the Bluegrass and Trust Co. , 18 S.W.3d 353, 358 (Ky. App. 1999) ).
i. Failure to promote
We will first address Lindsey's failure to promote claim. KRS 344.040(1)(a) provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, [or] age forty (40) and over[.]" And in Williams v. Wal-Mart Stores, Inc. , 184 S.W.3d 492 (Ky. 2005), the Supreme Court of Kentucky noted that there are two methods to establish a claim for discrimination: "There are two paths for a plaintiff seeking to establish a[ ] ... discrimination case. One path consists of direct evidence of discriminatory animus. Absent direct evidence of discrimination, Plaintiff must satisfy the burden-shifting test of [ McDonnell Douglas ]." Williams , 184 S.W.3d at 495.
On appeal, Lindsey asserts that Snow's alleged comments regarding black women being assertive and black women not having management positions are direct evidence of discriminatory animus. As a primary matter, we do not condone such comments or the thinking behind them. However, the fact that we agree that the comments are offensive and repugnant does not, by itself, mean that Lindsey has adduced direct evidence of a discriminatory animus with respect to her failure to promote claim. "Direct evidence of an unlawful employment practice is evidence that directly reflects the alleged animus and that bears squarely on the contested employment decision.... [D]irect evidence does not include stray remarks in the workplace ... or statements by nondecision-makers." Hallahan v. The Courier-Journal , 138 S.W.3d 699, 710 (Ky. App. 2004) (citations omitted). It is undisputed that Snow was not in charge of deciding whether Lindsey would be promoted to the Clinical Coordinator position at UK. As such, Lindsey cannot rely on Snow's comments to establish direct evidence of discrimination.
Absent direct evidence of discrimination, we must turn to the McDonnell Douglas framework. Lindsey must prove that (1) she was a member of a protected class; (2) she was qualified for and applied for an available position;[13] (3) she did not receive the position; and (4) the position remained open and UK sought other applicants with Lindsey's qualifications. McDonnell Douglas , 411 U.S. at 802, 93 S.Ct. 1817. As a racial minority and female, Lindsey can prove that she was a member of a protected class. She also can prove that she was qualified for the Clinical Coordinator position. However, Lindsey cannot prove that she applied for the available position that she challenges on appeal-that is, the position posted on January 22, 2004.[14]
*89 Lindsey has failed to produce any evidence to support her claim that she actually applied for this position in response to the January 2004 posting. The position was originally posted on October 6, 2003, and the record indicates that Lindsey properly applied for the position at that time. However, when Broome decided not to resign, UK recalled the posting and terminated the application process. When Broome vacated the position a few months later, the position once again came open. A new online vacancy was posted. And, as the circuit court pointed out, the sworn affidavit of UK's manager of HR, Lasley, indicates that Lindsey did not submit an application for the vacancy in January of 2004. Moreover, Lindsey does not contest that she failed to respond to the posting in January of 2004, and Lindsey has not put forth any evidence from which a trier of fact could conclude that Lindsey's prior application carried over.
In other words, Lindsey cannot show that she properly applied for the posting in January of 2004. This is fatal to her discrimination claim. Lindsey cannot establish a failure to promote claim due to discrimination because she cannot prove a prima facie case. Accordingly, we must affirm the circuit court's decision to grant UK and its personnel summary judgment on this claim.
ii. Retaliation
Lastly, we will address Lindsey's retaliation claim. To establish a prima facie case of retaliatory discharge, a plaintiff must meet a modified McDonnell Douglas formula:
(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.
Brooks v. Lexington-Fayette Urban County Housing Authority , 132 S.W.3d 790, 803 (Ky. 2004) (quoting Christopher v. Stouder Memorial Hospital , 936 F.2d 870, 877 (6th Cir. 1991), cert. denied , 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed. 2d 749 (1991) ); see also Asbury University v. Powell , 486 S.W.3d 246, 258 (Ky. 2016).
In applying the modified McDonnell Douglas formula to this case, resolving "[a]ll doubts ... in favor of the party opposing the motion [for summary judgment,]"[15] it is our opinion that Lindsey can establish a prima facie case sufficient to survive summary judgment. (1) Lindsey engaged in activities protected by Title VII when she filed a grievance against UK on April 9, 2004, and subsequently filed suit against UK in August 2005 based on both racial and gender discrimination. "[U]nder the federal rule, all that is required to obtain retaliation protection under KRS 344.280(1) is that the employee have a reasonable and good faith belief that the adverse employment practices she opposed were KCRA violations." Powell , 486 S.W.3d at 252 (internal quotation marks and citation omitted). Lindsey, here, alleged race-based and gender-based employment discrimination made unlawful by KRS 344.040 ;[16] therefore, her activities were protected. See id. at 259 ("[Powell's]
*90 complaints involved alleged sex-based employment discrimination made unlawful by KRS 344.040(a) and, as such, were protected activities under KRS 344.280(1)."). (2) UK knew about her protected activities because it responded to both her grievance and her lawsuit. (3) UK took an adverse employment action when it terminated Lindsey, and (4) there was a causal connection, established by circumstantial evidence, between the protected activity and the adverse employment action.
In cases where there is no direct evidence of a causal connection, the causal connection of a prima facie case of retaliation must be established through circumstantial evidence. Nguyen v. City of Cleveland , 229 F.3d 559, 566 (6th Cir. 2000). Circumstantial evidence of a causal connection is "evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." Id. at 566.
Brooks , 132 S.W.3d at 804.
Although Lindsey has failed to come forward with any evidence that Turner knew about her protected activities (the grievance and the lawsuit) when Turner made the decision to recommend Lindsey's termination, a careful reading of the record-including the verified cross-claim Turner initially filed then dismissed-reveals that Turner was instructed to find a "legitimate" reason to terminate Lindsey. Turner's pleading indicates that she did not desire to terminate Lindsey, but felt pressured to do so by her supervisors. Moreover, given that it is undisputed that UK knew about Lindsey's grievance and lawsuit, we believe that this is sufficient evidence to raise the inference that Lindsey's grievance and lawsuit was the likely reason for her firing.
UK cannot immunize itself based on Turner's ignorance alone. The United States Supreme Court has explained that even if the ultimate decision maker performs an "independent investigation[,]" liability can still attach based on causation principles if that decision maker relied, at least in part, on the recommendations or reviews of those with a discriminatory intent.
We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.
Staub v. Proctor Hosp. , 562 U.S. 411, 421, 131 S.Ct. 1186, 1193, 179 L.Ed. 2d 144 (2011).
This is known as the "cat's paw" theory of liability.[17] Id. A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." Id. Thus, even if Turner herself lacked discriminatory intent, UK may *91 nonetheless be liable if Turner's decision to recommend Lindsey's termination was caused by one of its agents acting with a discriminatory intent.[18] This appears to be precisely what Turner alleged occurred in her cross-claim.[19] According to Turner, she would have never recommended Lindsey's termination if she had not been instructed to do so.
Under Staub , racial animus can be imputed to Turner where Lindsey can show (1) that Snow (or other officials) intended to cause an adverse employment action and (2) that but for Snow's actions Turner would not have recommended Lindsey's termination. Seoane-Vazquez v. Ohio State University , 577 Fed.Appx. 418, 428 (6th Cir. 2014).
The cross-claim Turner verified as being true and correct, states in relevant part:
6. [Turner] was an employee of [UK] from January 2006 until December 2010, when she was informed that her position had been eliminated.
....
8. Among [Turner's] employment responsibilities was the supervision of [Lindsey].
9. Soon after [Turner] commenced employment, she was advised [Lindsey] was not a desirable employee and should be terminated by [Turner].
10. Turner objected to the suggestion that she should terminate [Lindsey], and insisted that she be allowed to evaluate [Lindsey's] performance and make an independent judgment as to [Lindsey's] ability to perform her job responsibilities at an acceptable level.
11. Subsequently, [Turner] was repeatedly instructed to cease certain training and supervisory activities that she had undertaken in an effort to assist [Lindsey] in improving her performance so as to avoid adverse employment action by [UK].
12. [Turner] was further instructed to closely scrutinize [Lindsey] and document her performance in order to justify adverse employment action toward [Lindsey].
13. [Turner] eventually recognized that her efforts to improve [Lindsey's] job performance were unwelcome by her superiors, and, fearing for her own job security, she abandoned her efforts to support [Lindsey] and followed instructions to build a case against [Lindsey] for a performance-based termination.
14. Under pressure from her superiors, [Turner] thereafter signed documents prepared by her superiors, including the termination notice ultimately delivered to [Lindsey], gave testimony in connection with [Lindsey's] unemployment claims and these proceedings in accordance with instructions she received from [UK] and its representatives; and otherwise supported [UK's] efforts to terminate [Lindsey].
15. In retaliation for her resistance to [UK's] pressure to take adverse employment action against [Lindsey] without affording [Lindsey] a reasonable opportunity to improve her performance, and her repeated efforts to support [Lindsey] rather than summarily disciplining or discharging her, [UK] engaged in a *92 pattern of unlawful conduct toward [Turner], including ... [demoting, harassing, and terminating her.]
Lindsey had a discrimination lawsuit pending against UK. Snow was aware of the suit. Snow told Turner that Lindsey was not a desirable employee and "further instructed [Turner] to closely scrutinize [Lindsey] and document her performance" so that UK could justify firing Lindsey. At the same time, in order to give Turner a "clean slate[,]" UK decided not to inform Turner of Lindsey's lawsuit. Based on Turner's statements in her verified cross-claim, it appears that Snow's request for Turner to closely scrutinize Lindsey so that UK could justify firing Lindsey was the reason Turner ultimately recommended Lindsey's termination. Moreover, Turner's statements indicate that "but for" UK's pressure on Turner to recommend Lindsey be terminated, Turner would have not have terminated her when she did. Turner plainly stated in her cross-claim that she believed Lindsey should have been given more support and "a reasonable opportunity to improve her performance."
Such evidence, while not conclusive, is sufficient, for purposes of summary judgment, for Lindsey to raise the inference that Snow's request that Turner closely scrutinize Lindsey was made in retaliation, and with discriminatory animus, for Lindsey's grievance and lawsuit against UK. See Bishop v. Manpower, Inc. of Cent. Kentucky , 211 S.W.3d 71, 77 (Ky. App. 2006) ("But after Bishop pursued his workers' compensation claim, the decision makers at Manpower began to scrutinize his employment record more closely. Such conduct may raise an inference that Manpower's decision was substantially motivated by a discriminatory intent."). Additionally, even though UK points to Lindsey's performance deficiencies as being the reason for her termination, Turner's verified statements certainly suggest that the deficiencies were simply used as a pretext to justify terminating Lindsey. See Kentucky Center for the Arts v. Handley , 827 S.W.2d 697, 701 (Ky. App. 1991) ("If the employer articulates a legitimate, non-retaliatory reason for the decision, the employee must show that "but for" the protected activity, the adverse action would not have occurred."); see also Chattman v. Toho Tenax America, Inc. , 686 F.3d 339, 353 (6th Cir. 2012).
III. CONCLUSION
For the foregoing reasons, we affirm the circuit court's orders regarding discrimination and find no error in the circuit court judge's refusal to recuse. However, we reverse the circuit court's order regarding retaliation and remand the case to the circuit court for further proceedings consistent with the opinion expressed herein.
STUMBO, JUDGE, CONCURS.
J. LAMBERT, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

Over the years at UK, Lindsey worked as a certified nursing assistant in patient care, as a clerk processing orders, and as a patient relations counselor performing outpatient registration and medical coding and billing.

Snow explained in her deposition that her duties included personnel and financial management, hiring and firing, performance evaluations, and making sure the working environment was good for the staff. Unless there was a major problem, Snow did not deal with the promotion process. That was usually handled by the clinic manager and the surgery department staff, who worked with human resources.

According to the records reviewed by Catherine Lasley, Lindsey did not disclose her race on her application.

Lindsey first filed her discrimination and retaliation claims with the Equal Employment Opportunity Commission ("EEOC") on October 12, 2004. But after the EEOC referred the case to mediation, Lindsey, on November 29, 2004, withdrew her complaint.

Her responsibilities, at that time, included cash handling/fee entry (50%), scheduling (20%), open encounters (20%), patient correspondence (5%), and other duties (5%).

For instance, Lindsey had the added responsibility of coding, or extracting a diagnosis from a doctor's note. Ideally, Lindsey would have simply read the doctor's diagnosis from the fee sheet to complete fee entry. However, because such diagnoses were being left off the fee sheets, it became part of Lindsey's job to extract, or find, the diagnosis from the doctor's note.

Lindsey alleged retaliation against Mr. Eades and Ms. Turner, and she alleged both retaliation and discrimination against UK.

McDonnell Douglas Corp. v. Green , 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973).

Although Lindsey believes that she was passed over for the Clinical Coordinator position on three separate occasions, on appeal, she only challenges the position posted on January 22, 2004, by asserting facts and arguments related only to that posted position.

For the position posted in 1999, which was given to Denise Holder, Lindsey testified that she did apply. However, on appeal, she does not allege discrimination regarding the position posted in 1999. She only refers to facts regarding the positions given to Eades in her brief. Furthermore, Lindsey admitted in a deposition that she did not have the facts to even allege discrimination in 1999. For the position posted on February 25, 2002, which was given to Broome, Lindsey testified that she did apply, but the records reviewed by Catherine Lasley indicate that Lindsey had not, in fact, applied for the position.

City of Florence v. Chipman , 38 S.W.3d 387, 390 (Ky. 2001).

It is unlawful for an employer to "fail or refuse to hire ... any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment, because of the individual's race ... [or] sex...." KRS 344.040(1)(a).

As explained in Staub ,
The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. See Shager v. Upjohn Co. , 913 F.2d 398, 405 [ (7th Cir.1990) ]. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.
Id. at 415 n.1, 131 S. Ct. at 1190.

The theory of cat's paw liability has been applied in a number of employment-related scenarios that extend beyond the facts presented in Staub . See R. Scott Oswald, Evolution of the Corporate Knowledge Doctrine and the "Cat's Paw" Theory , 29 Westlaw Journal Employment 1 (2015).

Even though Turner ultimately withdrew her cross-claim, the cross-claim was filed of record and verified by Turner as true and correct.